**Application of Lester L. SPILLER.**
**Patent Appeal No. 9174.**

United States Court of Customs
and Patent Appeals.
Aug. 8, 1974.
Rehearing Denied Nov. 14, 1974.

Arnold G. Gulko, Arlington, Va., Dressler, Goldsmith, Clement & Gordon, Ltd., Chicago, Ill., attorney of record, for appellant; David H. Badger, Ransburg Corporation, Indianapolis, Ind., of counsel.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents. Fred W. Sherling, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, LANE and MILLER, Judges, and ALMOND, Senior Judge.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals, adhered to on reconsideration, affirming the rejection of claims 1–7 and 9–31 under 35 U.S.C. § 103, the rejection of claims 30–31 under 35 U.S.C. § 102, and the rejection under 35 U.S.C. § 112 of claims 1–2, 4–7, 9–11, and 19–23, of application serial No. 607,418, filed January 5, 1967, for "Manufacture of Paper and Similar Cellulosic Materials of Modified Surface Property by Electrostatic Application of Dry Powdered Starch to the Water-Wet Web Being Processed." We reverse in part and affirm in part.

*The Invention*

The invention relates to the manufacture of cellulosic sheet material such as paper which is coated with starch to improve its surface properties. Uniform coating of the paper is accomplished by electrically grounding the wet paper and electrostatically charging dry starch particles which are suspended in the atmosphere surrounding a water-wet web of paper, perhaps while the paper is still within a paper-making machine and on a Fourdrinier wire. This charge prevents the starch particles from contacting one another in the damp atmosphere near the wet web, and the electrostatic forces cause the starch to penetrate the air stream associated with the moving wet web and to gently attach themselves to the surface of the wet web.

The claims are numerous. The majority are directed to methods of manufacture of paper; claims 26–29 are allegedly directed to the resulting sheet of paper, 28 and 29 being specific to newsprint. Claims 30 and 31 are directed to the improvement in a conventional paper-making machine which comprises means for the electrostatic deposition of charged starch particles therein. Representative are claims 1, 26, 30, and 31.

1. A method of manufacturing a fibrous, absorbent, cellulosic sheet material, the steps comprising forming a water-wet web containing at least 25% by weight of water of fibrous cellulosic sheet material, depositing dry particles of starch upon said wet web by advancing said web past a particle deposition zone and supplying to said particle deposition zone said dry particles of starch electrostatically charged for mutual repulsion whereby said starch particles will be electrostatically attracted to and uniformly deposited upon said wet web in the form of separated particles and in amounts sufficient to be capable of causing selective modification of surface properties of the sheet material, and then dewatering said web.

26. A sheet of paper, said sheet having deposited on at least one side thereof starch particles in an amount of at least .02 pound of starch per 1000 square feet of surface, said starch particles being partially gelatinized in adherent association with the fibers on the surface of said paper and the majority of said starch par-

ticles being separated from one another on said paper.

30. In a paper-making machine the improvement which comprises means for advancing a wet paper web past a particle deposition zone, means for supplying to said particle deposition zone electrostatically charged particles of starch whereby such charged particles will be attracted to said paper web in the form of separate particles and uniformly deposited thereon.

31. Apparatus as recited in claim 30 in which said particle deposition zone is positioned above the free upper surface of the paper as it is carried by said advancing means constituted by a Fourdrinier wire.

### The References and the Rejections

The references are:

| | | |
|---|---|---|
| Uong | 2,030,483 | Feb. 11, 1936 |
| Read et al. (Read) | 3,210,240 | Oct. 5, 1965 |
| Lichtenberger et al. (Lichtenberger) | 3,461,032 | Aug. 12, 1969 |
| (Effective filing date Nov. 24, 1965) | | |
| Smith et al. (Canadian) (Smith) | 704,036 | Feb. 16, 1965 |

Casey, Pulp and Paper, 2nd Ed., N. Y. Interscience, 1960, page 951.

Reif, "An Electrostatic Process for Applying Dry Coatings on Paper," TAPPI, October 1955, Volume 38, No. 10, pages 607–609.

The board having affirmed the rejection of claims and groups of claims on three different statutory bases, 35 U.S.C. §§ 102, 103, and 112, we shall deal with them individually.

### The Rejections Applying Lichtenberger

A principal issue is whether appellant's affidavit showing under Rule 131 is sufficient to remove Lichtenberger as a reference. Appellant admitted explicitly at oral argument, and implicitly in his briefs here and before the board, that the various rejections under § 102 and § 103 which use Lichtenberger alone or in combination with other references

were proper, and it was therefore essential to overcoming them that he remove Lichtenberger as a reference. Such rejections are applicable against all claims.

Lichtenberger is used as a reference in various ways. First, as against apparatus claims 30 and 31, which describe an improvement in a paper-making machine, Lichtenberger is applied alone under § 102, allegedly identically disclosing the invention. Secondly, Lichtenberger is applied alone under § 103 to claims 1, 2, 5, 9, 10, 11, and 19–23. Finally, all the other claims are rejected under § 103 in view of various combinations of Lichtenberger and other references, Lichtenberger and Smith to render obvious the invention of claims 3, 12, 13, 15–18, and 24–28, and additionally with Casey as to claims 4, 6, 7, 14, and 29. We have noted the various claims and the ways in which they were rejected on Lichtenberger alone, or in combination with other references, because of the differences which appear in this regard between this case and the prior Rule 131 cases in this court upon which the decision in this case is to rest.

### The Rule 131 Evidence

The inventor Spiller's affidavit and evidentiary material submitted therewith, including laboratory notebook pages and accompanying affidavit of Spiller's associate, Stephen J. Smith, establish that Spiller and his associate performed certain acts which, in his view, establish a reduction to practice of the claimed invention prior to the earliest effective filing date of Lichtenberger, November 24, 1965. Grounded wet TAPPI[1] blotting paper was moved over a fluid bed of powdered starch electrostatically charged to a level of 20–40 kilovolts. The starch was electrostatically propelled into contact with and adherently deposited on the surface of the wet paper, which had been pretreated with a solution of potassium iodide and iodine to color the deposited starch particles so

---

[1]. TAPPI is the acronym of the Technical Association of the Pulp and Paper Industry.

that they could be seen and the uniformity of the deposit thus observed. The paper sheet was oven dried and weighed prior to deposit of the starch and the wet paper with the starch deposit thereon was dried after the deposition to gelatinize the wet starch on the wet paper and redry the paper for subsequent weighing to determine the amount of starch deposited on the paper. The Smith notebook pages establish the various weight amounts of starch deposited on the paper at various voltages of electrostatic charge. Smith noted, "Works very well & can put as much on as we want." And also, "The higher the voltage the better the coverage."

Also in evidence is a short letter to appellant from L. S. Simser of August 12, 1965, who represented Penick & Ford Limited, of Cedar Rapids, Iowa, the company which supplied the starch and TAPPI blotting paper to appellant, and a portion of a letter from appellant's patent counsel, A. G. Gulko, dated October 14, 1965, which discusses appellant's invention. The latter apparently reported the results of a prior art search made on the invention (report not of record) and states Mr. Gulko's view of the invention as follows:

> As I understand the present development, finely divided soluble starch powder is deposited by means of electrostatic forces from a fluid bed onto the surface of wet paper. The fluid bed underlies the wet paper as it goes through the paper-making process where the wet paper contains between about 40% to 70% by weight of water.

Spiller's affidavit refers to the Gulko letter as helping to record the details of the "demonstration" relied upon for a reduction to practice. While various other facts shown by the affidavits or the Smith notebook pages will be discussed later, we will start from the proposition that appellant's affidavits and evidence establish electrostatic coating of dry starch particles on re-wet TAPPI blotting paper.

## The Opinion of the Board

The opinion of the board and the Examiner's Answer, with which the board agreed, list and discuss various *elements* of the thirty claims which are believed not to have been established by the affidavit showing. The examiner stated, in pertinent part (emphasis ours):

> The affidavits and exhibits do not show the *amounts* of claims 3, 12–18 and 24–29, nor the *water contents* of claims 1–25. There is no showing of any *apparatus* remotely like that of claims 30 and 31. There has been no allegation or showing that the starch was applied to a web containing *at least 25% moisture*. The affidavits and exhibits do not show a process or apparatus such as that *claimed*. Thus the affidavit fails to prove the *heart of the claimed invention*, ie, application of particles to a wet web. The affidavits do not prove that the process was done in conjunction with a papermaking machine nor that the apparatus was part of a papermaking machine.

The board added the following criticism of its own:

> There is no clear evidence of record that Appellant's technique employing wet TAPPI blotting paper is an industry-*recognized* test duplicative of wet web on a Fourdrinier wire. The notebook exhibits, describing work done some 4½ years prior to the affidavits, do not make it apparent that the starch deposited from a fluidized bed was *dry*, or that the paper was *wet*, or that there was any dewatering step, or indeed that the starch particles were "electrostatically charged for mutual repulsion" and "separated from one another," all as required by the claims. Nor is any ratio of starch to paper surface indicated, or any surface property mentioned which might have been modified by the treatment. In connection with the rejections of claims 17, 18, 25, 28, 29 and 31, note that the Rule 131 showing concerns

only depositing starch *underneath* the paper. Lichtenberger et al. stands as a valid reference.

And, in addition, the board incorporated in its opinion by reference the following portion of an opinion by another panel of the Board of Appeals in a copending application [2] of appellant where the merits of the same Rule 131 evidence were discussed:

> Considering the merits of the Rule 131 evidence, affiant Spiller, in his affidavit executed January 13, 1970, states that "TAPPI blotting paper, when wet, duplicates the condition of wet paper on a Fourdrinier machine." There is nothing to correlate this 1970 observation with the data recorded in the Smith notebook bearing dates in August and September 1965. The fragment of a letter appearing on the letterhead of Arnold G. Gulko refers to applying starch powder to "the wet paper as it goes through the paper-making process where the wet paper contains between about 40% to 70% by weight of water." Again there is no correlation between this observation and the Smith notebook entries. It would appear that appellant is attempting to create the illusion that the Smith laboratory work had something to do with the electrostatic deposition of dry starch in a wet web of paper on a paper-making machine, which concept is totally lacking in the Smith notebook entries but fully disclosed in Lichtenberger et al.

> At best, it would appear that Smith "shot" starch from a fluidized bed onto pieces of blotting paper of unspecified dimension and of unspecified, if any, water content. Such pieces of blotting paper hardly qualify as a "water-wet web" as required by the claims on appeal and as disclosed in Lichtenberger et al. Certainly if the water content of the blotting pa-

per was of significance with respect to starch deposition, this circumstance was unobserved by Smith. The Spiller affidavit states that "Both visual observation and microscopic observation demonstrated that the deposit was at the surface and uniform" but there is no evidence in this record concerning who made such observations or when they were made. There is nothing in the Smith notebook which indicates that any of the samples prepared by Smith were inspected.

### Appellant's Arguments

On the sufficiency of the affidavit showing, appellant's brief individually attacks each reason given by the examiner and both boards as to why the showing made by appellant does not satisfy each limitation of the claims. For example, in answer to the specific allegation that the acts established by the affidavit showing do not include the use of a water-wet web containing at least 25% moisture, which is a limitation of all method claims 1–7 and 9–25, appellant states that "the mere characterization of paper as 'wet' [which is what is established by the Spiller affidavit and Smith notebook] roughly indicates at least this amount of water." In addition, appellant maintains that the quoted portion of the contemporary letter of counsel "indicates that the work done was estimated to have been done with paper wet with: '. . . between about 40% to 70% by weight of water'." With respect to the board's comment on the failure of the affidavit showing to establish "any ratio of starch to paper surface," called for by many dependent claims, appellant notes only that many of the claims (1, 2, 4–11, 19–23, 30, and 31) do not specify the ratio of starch to paper surface. And as to the board's criticism of the appropriateness of

---

2. Application of Lester L. Spiller, serial No. 607,511, for "Manufacture of Paper and Similar Cellulosic Materials of Modified Surface Property by Electrostatic Application of Dry Powdered Water-Sensitive Resin to the Water-Wet Web Being Processed," board opinion of April 30, 1971.

TAPPI blotting paper as representative of the condition of the wet web of paper on the Fourdrinier paper-making machine, appellant notes that Spiller's affidavit specifically alleges that "TAPPI blotting paper, when wet, duplicates the condition of wet paper on a Fourdrinier machine." Appellant further states that blotting paper is merely a web of uncompacted paper fibers so that when it is wet it is then a water-wet web, and, accordingly, the only difference between it and the web on a paper-making machine is perhaps that the latter is continuous, and the blotting paper is of a specific length.

### The Prior Cases

The problem with the characterization of the Rule 131 sufficiency issue by the examiner and the two boards is that it is nowhere stated just what appellant must show in order to antedate Lichtenberger. The examiner first stated that "The affidavits and exhibits do not show a process or apparatus such as that claimed," thus implying that it is necessary to show a reduction to practice of the invention as it is claimed, presumably in each and every claim. Then the examiner states that, "Thus the affidavit fails to prove the *heart of the claimed invention*, ie, application of particles to a wet web." (Emphasis ours.) But what is the "heart" of the claimed invention, and how is it to be determined when there are many different claims?

As noted earlier, appellant's brief attempts to refute each factual statement of the examiner and the board panels, but, like them, never cites any standard for what must be shown to antedate Lichtenberger, in relation either to what Lichtenberger shows or to what is claimed. The solicitor's brief, for the first time in the prosecution of this application, states what he believes the decisions of this court suggest a patent applicant must show to antedate a reference, saying:

It is submitted that appellant has failed to show "priority with respect to so much of the claimed invention as the reference happens to show." In re Stempel, 241 F.2d 755, 44 CCPA 820 [1957]. Also, appellant has failed to show prior "possession of either the *whole* invention claimed or something falling *within* the claim, in the sense that the claim as a whole reads on it." In re Tanczyn, 347 F.2d 830, 52 CCPA 1630 [1965].

*Stempel* and *Tanczyn* at least lay a foundation for determining the sufficiency of the Rule 131 showing, but how are the two quoted statements applicable to the situation here? If what the reference shows is the important factor, no one has delineated what this is and whether the Rule 131 affidavits show it, particularly since the "claimed invention" varies with the individual claims. If apparatus claims 30 and 31, referring to "a paper-making machine," represent the claimed invention, then, at least according to the admittedly correct examiner's rejection of these claims, the reference shows the invention. If, however, the invention is taken to be what is claimed in the method claims, Lichtenberger may not specifically show the invention but may render it obvious, at least according to the § 103 rejections made in view of Lichtenberger alone, or in view of one or more other references.

Taking what the affidavits and other evidence show as having been performed, again great variances exist for individual claims. Asking whether claims 30 and 31, in the words of *Tanczyn*, "read on" what appellant did prior to the effective date of the reference, might require a negative response because of the fact that appellant's demonstration used no Fourdrinier paper-making machine. In this sense, appellant shows less than what the reference shows. Using method claim 1, supra, as representative of the invention, however, the answer to the question whether this claim "reads on" appellant's prior activities may depend on whether it is estab-

lished that appellant's paper contained "at least 25% by weight of water."

Resolution of the question of the sufficiency of the Rule 131 showing resides, at least in part, in decisions of this court after *Tanczyn*, not cited by either party, which dealt with fact situations where the showing made by Rule 131 affidavits was less that the invention *claimed* but was held sufficient to remove the cited reference because the differences were obvious. In re Hostettler, 356 F.2d 562, 53 CCPA 1069 (1966); and In re Stryker, 435 F.2d 1340, 58 CCPA 797 (1971).

In *Stryker*, we determined the sufficiency of a Rule 131 showing which established all of the *claimed* invention *except* for specific weight percentage limitations. We noted that appellant's showing was commensurate with that of a Harban reference, which had been solely relied upon by the Patent Office to render the claimed invention obvious, and that it was the specific weight percentages which appellant's affidavit evidence failed to establish which were considered by the Patent Office to be obvious in view of the reference. We noted that the "differences between the claimed invention and the reference disclosure [as well as appellant's Rule 131 showing] are so small as to render the claims obvious over the reference [and over appellant's showing]," and held the showing sufficient to antedate the reference. The board in *Stryker,* like the examiner here, had stated the proposition, for which *Tanczyn* was cited, that "The *claimed* invention must be shown in the affidavit, i. e., the [weight percentage limitations]." We held that this was not necessary, saying:

To hold that Harban is not removed by the showing here presented would lead to an anomalous result, i. e., if appellant broadened his claims by deleting the weight limitations, so as to read literally on Harban, Harban would not be available as a reference against such broadened claims because appellant's antedating affidavit would be satisfactory in every respect. It cannot be the law that the same affidavit is insufficient to remove the same reference applied against the slightly narrower claims presented here. [Footnote omitted.]

The situation here with respect to the invention of, for example, claim 1, is much like that in *Stryker*. The original rejection by the Patent Office was for obviousness over a single reference, Lichtenberger. Appellant's showing seems to be commensurate with the showing of the reference, but, as noted by the examiner and by the board in the related application, neither expressly shows the limitation of the claim that the wet web contains "at least 25% by weight of water."[3] This is like the reference disclosure and affidavit showing in *Stryker* which failed to show the weight percentage limitations of Stryker's claims.

■■ Many dependent claims also raise the question whether the situation in *Stryker,* where the differences between the claimed invention and what the reference and affidavits showed were "so small as to render the claims obvious" to one skilled in the art in view of a single reference, ought to be extended to a situation where part or all of the differences are rendered obvious, not merely by the knowledge of one

3. Lichtenberger's web, like that in appellant's showing, is taught to be wet; and both *may in fact* contain the minimum quantity of water claimed. Lichtenberger does not specifically teach this, however, and we do not find that the water quantity has been established by appellant's evidence. There is nothing in the Gulko letter to tie the water percentage figure mentioned to the *demonstrations* relied upon for reduction to practice. The water percentage figure could just as well have come from appellant's conception of the invention as from the demonstrations. However, we do think appellant established that his web was "wet" during the demonstrations. Appellant's blotting paper web is clearly shown by the Smith notebook to have been electrically "grounded," and a wet starch indicator (potassium iodide and iodine solution) was used thereon.

skilled in the art but by *other references* available as of the date of the alleged reduction to practice. This court has recently answered that question in the affirmative, at least when a single other reference is involved, in In re Dardick, 396 F.2d 1234 (CCPA 1974), and we see no reason to distinguish the situation where two other references are used. As we noted in *Dardick*, the reference —or the references—are merely used to show what one skilled in the art would be expected to know as of the date of the reference which has been removed. The only additional caveat which ought to be added is that the affidavit showing must still establish possession *of the invention* and not just of what a reference happens to show if this is "wholly outside" what is being claimed. In re Tanczyn, supra.

The invention embodied in claims 30 and 31 raises an additional difference between this case and the situation in *Stryker*. In *Stryker*, we said that "the differences . . . are so small as to render the claims obvious over the reference," and Stryker's Rule 131 showing was commensurate with the reference. Here, taking as the invention and embodiment of claims 30 and 31, appellant's showing may well render the invention as there claimed obvious, but it does not appear to establish possession of all the limitations of these claims since appellant's demonstration did not include the use of his electrostatic deposition technique on a Fourdrinier papermaking machine. The question, then, is whether the rule of *Stryker* ought to be extended to a situation where the Rule 131 showing is not fully commensurate with the reference but renders the claimed invention obvious. We think *Stryker* is controlling in this situation as well, and that such an extension of *Stryker* is supported by our earlier decision in *Hostettler*, supra.

In *Hostettler*, we considered the sufficiency of a Rule 131 showing under conditions similar to the present situation as it relates to claims 30 and 31. The invention was a catalytic process for producing urethane. The reference, which admittedly anticipated the invention, showed the claimed process as producing *poly*urethane, while the Rule 131 showing established the use of the catalyst only to produce a *monomeric* urethane compound. Our opinion characterized the invention as "the use of a catalyst in a process involving an old reaction" and held the showing sufficient, although relating to an embodiment of the invention *different* from that shown by the reference. Using a prior art Rothrock patent, cited during the prosecution, as indicative of the knowledge of one in the art, we concluded that "one of ordinary skill in the art would be satisfied from the facts shown in the affidavit that appellants had completed the invention as defined in the claims." We stated:

It is clear on this record that one of ordinary skill in this art would consider that functionality of the reactants determines whether the products are "monomeric" or polymeric, but not that functionality would matter insofar as the reaction using the catalyst is concerned. The statement as to unpredictability of catalytic activity [by the examiner], while relevant, is so general as to afford little assistance in the determination of the precise issue before us. In fact, the more specific showings in the affidavit and the Rothrock patent indicate that one of ordinary skill in this art would expect that a catalyst for the particular functional groups involved in the reaction would operate relatively independently of the number of those groups on the reactant molecule. Thus we conclude that one of ordinary skill in the art would be satisfied from the facts shown in the affidavit that appellants had completed *the invention* as defined in the claims. See In re Fong, supra [288 F.2d 932, 48 C.C.P.A. 897 (1960)]. Certainly appellants should not be required to submit facts under

Rule 131 showing that they reduced to practice that which is obvious in addition to those facts offered as showing a completion of the invention, for the purposes of antedating a reference. [Footnote omitted.]

The *Fong* case cited in the above quotation is significant here. We believe that similar considerations govern our decision and that, for the purpose of antedating the Lichtenberger reference under Rule 131, it is sufficient that appellant has shown a reduction to practice of his basic invention, which showing will also suffice as to claims differing therefrom only in details which are obvious to one of ordinary skill in the art.

■ The heart of this invention is clearly the use of *electrostatic forces* to apply *dry starch* particles to a *wet paper web*. The differences which exist between the claimed invention and the specific reduction to practice established by the Rule 131 showing are such as would be obvious to one of ordinary skill in this art. In re Stryker, supra; In re Dardick, supra; In re Hostettler, supra; In re Fong, supra.

We are satisfied that the differences in the embodiments called for by the claims are so small that the claimed invention would have been obvious. Taking the claims in numerical order, claim 1, and the claims dependent thereon, call for a moisture content of "at least 25% by weight of water" in the web. While we are not satisfied that the Rule 131 showing establishes this content *in the reduction to practice*,[4] we are satisfied that, at the least, one skilled in this art would find it obvious to have an admittedly "wet" web contain such an amount of moisture and that wet blotting paper would be considered to be a "water wet web."

With respect to limitations of the claims which require specific ratios of starch to paper surface and the modification of surface properties by the deposition of starch on the paper, we are satisfied that these limitations too would be obvious to one skilled in the art familiar with the facts shown by the Spiller affidavit and the Smith notebook entries. Certainly it was well known that starch modified the surface properties of paper generally. It was no part of applicant's invention to apply starch to paper. He merely applied it by a new technique. The fact that *several* different weights of starch were applied to the paper by various numbers of passes and with various values of voltage would render the deposition of specific amounts which are claimed obvious.

■ With respect to the deposition of starch on both sides of the paper, called for by claims 17, 18, 28, 29 and 31, which the board found unsupported by the Rule 131 showing of "only depositing starch *underneath* the paper," this and the other differences called for by the claims over what was reduced to practice would clearly be obvious to one of ordinary skill in this art.[5]

The differences between the Rule 131 showing and the invention as it is described in claims 30 and 31, which call for using the electrostatic starch deposition technique in a paper-making machine and on the Fourdrinier wire thereof, are also obvious differences. While appellant's argument, and consequently the Patent Office response thereto, centered on the equivalence or duplication of the conditions of the wet paper on the Fourdrinier machine by the use of wet TAPPI blotting paper, we think that the obviousness of the use of the technique on the paper-making machine, as claimed, is clear. Spiller's affidavit states that

4. See note 3, supra.

5. Since the purpose of the Rule 131 showing is to establish broadly possession of the invention, In re Tanczyn, supra, it is proper to consider the obviousness *of the differ-* ences between what is shown and what is claimed because possession of what is shown carries with it possession of variations and adaptations which would, at the same time, be obvious to one skilled in the art.

"TAPPI blotting paper, when wet, duplicates the condition of wet paper on a Fourdrinier machine," and the contemporaneous letter of Simser made reference to the use of electrostatic coating "in the paper industry." If there is any doubt as to the knowledge of one skilled in the art, it is cléar from the Uong reference that the art had long known of depositing dry coatings directly upon the water-wet paper web on the Fourdrinier wire in a paper-making machine.

Accordingly, the rejections under § 102 and § 103 in view of Lichtenberger and Lichtenberger in combination with other references are reversed.

### The Prior Art Rejections Exclusive of Lichtenberger

■ We have studied the five references variously applied by the Patent Office under § 103 and have concluded that they do not render obvious the *electrostatic* deposition of dry starch on a wet paper web. The only reference which deals with electrostatic coating is Reif, which discloses coating finely divided powders on a dry paper web. The solicitor notes correctly that "Reif does not [explicitly] disclose whether the paper being coated is wet or dry." However, it is quite clear from the Reif disclosure that the paper is not at all wet. Reif states:

> Web speed probably will be limited only by the rate at which the electrical charge can leak off the powder deposited on the web. The electrical charges must drain off the coated web before leaving the strong electrostatic field. Otherwise, repulsion of the like charges on the web and coating powder may cause disturbances in the coating that will mar the appearance of the finished paper.
>
> Once the coating is deposited on the paper and leaves the coating unit, it is fixed to the paper with heat. This fusing is done as the web passes through an infrared oven or over a heated roll.

Had the paper been wet, there would be no need to drain the charge off the coated web to avoid disturbances in the coating before the application of heat to fix the coating to the paper. Moreover, we cannot accept the argument of the solicitor that "dry paper contains a substantial amount of moisture" as a teaching that the paper may be wet.

In addition, we can find no reason why it would be obvious to one skilled in the art to combine the Reif teachings of using electrostatic forces in paper coating with the teachings of the other references, which suggest coating paper with starch in either wet or dry form. The wet application of starch is shown by Read, Smith, and Casey and electrostatic forces would be useless in combination therewith. Uong does teach the application of powdered coating materials to the wet web of paper in a paper-making machine, but we do not believe that it would have been obvious to one of ordinary skill in the art to combine electrostatic force therewith. We agree with appellant that the use of starch particles in the Uong enclosure above the wet web would probably result in the formation of starch agglomerates and make the process inoperable. The solicitor's answer (to appellant's assertion) that "it would be all the more obvious to electrostatically charge the particles as taught by Reif since the well-known advantage of electrostatic coating is the prevention of agglomeration" is a hindsight application of appellant's teachings. Reif does not teach such an advantage and, using a dry insulated sheet and not starch, never had such a problem to overcome.

Accordingly, the rejections under 35 U.S.C. § 103 of claims 1–7, 9–25, and 30–31 are reversed.

■ As to the four claims 26–29, which recite sheets of paper coated with various amounts of starch with "the majority of said starch particles being separated from one another on said" paper surface, we agree with the solicitor that "appellant has failed to show that the product is unobviously different from that of Read or Smith." These claims are not limited to the starch coated pa-

per produced through electrostatic coating of wet paper, and we do not believe that they have been shown to sufficiently distinguish over the art by the properties of the starch on the paper and such limitations as that above-quoted. The rejections of claims 26–29 under § 103 are affirmed.

### Section 112, Indefiniteness

The board affirmed the rejection of claims 1, 2, 4–7, 9–11, and 19–23 under the second paragraph of § 112 for the reasons given by the examiner, which are:

> Applicant has failed to recite the amount of starch applied to the web in quantitative terms or in definite qualitative terms. Applicant relies on the phrase "in amounts sufficient to be capable of causing selective modification of surface properties". It is not even clear whether the modification will improve the properties or what properties will be modified. These properties could range from pick resistance, smoothness, sizing, wet strength, color to the taste. Furthermore, it is not clear whether applicants' claims are meant to include the application of two or three particles, because two or three particles would selectively modify the surface properties. Likewise a coating of starch one inch thick on the surface of the web would also modify the surface.

■■ We recently restated what is meant by the "indefiniteness" requirement of § 112. It is essentially a requirement for *precision and definiteness* of claim language so that the claims make clear what subject matter they encompass and thus what the patent precludes others from doing. In re Conley, 490 F.2d 972 (CCPA 1974). Taking the requirement as such, we find that there is no indefiniteness in the use of the above-quoted language in the rejected claims. There is nothing indefinite in the use of claim language which defines particular amounts according to a functional criterion. See In re Fuetterer, 319 F.2d 259, 50 CCPA 1453 (1963); In re Swinehart, 439 F.2d 210, 58 CCPA 1027 (1971).

■ The examiner's statement that "It is not even clear whether the modification will improve the properties," and his extreme example that "a coating of starch one inch thick on the surface of the web would also modify the surface" almost suggest that there is something sinister in appellant's claiming something which would not, *in the examiner's view,* "improve" the properties of the paper coated. As far as the rejection of the claim language for idefiniteness is concerned, we think that the claims make it clear, through the use of the word "selective," that any modification of surface properties is subjectively desirable in the particular coating applied. Even a "selective" modification of surface properties through the application of an inch of starch to the coated paper —absurd though that would be—would be within the language of the claims. Thus the claim language makes clear what subject matter they encompass.

In In re Conley, supra, we dealt with, and reversed, a similar rejection of claims as indefinite for failure to recite specific proportions and amounts of certain ingredients, one of which was the proportion of satin white in an aqueous suspension. Appellants in *Conley* maintained that there were "no critical proportions of satin white in aqueous suspension." We note that here also there is no criticality in the amount of starch which is to "be electrostatically attracted to and uniformly deposited upon" the wet web, and we agree with appellant that there is no reason why he must state in his claims "a feature of no importance" to his invention, which, as previously noted, is the electrostatic deposition of dry starch on wet paper. As appellant's brief points out, the original reduction to practice of the invention, which appears from the Rule 131 affida-

vit evidence, shows that from the very beginning it was determined by appellant's associate that, with respect to the amount of starch deposited, we "can put on as much as we want." And appellant's specification states that:

> In practicing the present invention, the amount of starch applied can be varied considerably while still achieving some of the benefits of the invention.

Accordingly, we find no indefiniteness in defining the amount of starch. The rejection of claims 1, 2, 4–7, 9–11, and 19–23 for indefiniteness is reversed.

### Summary

In accordance with the foregoing, the rejections of claims 1–7, 8–25, and 30–31 are reversed, and the rejection of claims 26–29 under § 103 is affirmed.

Modified.