Charles d'A. HUNT, Appellant,

v.

Helmut TREPPSCHUH and Robert L. Hentrich, Appellees.

Patent Appeal No. 74–570.

United States Court of Customs and Patent Appeals.

Oct. 16, 1975.

Larry R. Cassett, Woodbridge, N. J., atty. of record, for appellant.

Revere B. Gurley, Arlington, Va., atty. of record, for appellees.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MILLER, Judge.

■ This appeal is from that part of the decision of the Board of Patent Interferences, which involves appellant Hunt's continuation-in-part[1] of an earlier filed parent application[2] and the patent[3] of appellees Treppschuh et al., awarding priority of invention with respect to count 7 to the patentees.[4] The sole question is whether count 7 is supported in Hunt's parent application, which is relied on as a constructive reduction to practice. The answer depends on whether the parent application includes a disclosure of an embodiment within the count that meets the requirements of the first paragraph of 35 U.S.C. § 112. *Swain v. Crittendon*, 332 F.2d 820, 51 CCPA 1459 (1964). We reverse.

## The Invention

The invention relates to a process of purifying metals and alloys, especially steels, by heating under very low pressure. The very low pressure induces the vaporization of volatile impurities. Volatile alloying ingredients, such as manganese in steel, also vaporize when heated under very low pressure. The vaporized alloying materials are replaced during a subsequent heating step. Sufficient pressure is thereafter maintained on the melt to prevent further vaporization of alloying ingredients.

## The Count

Hunt copied count 7 from the Treppschuh et al. patent into his pending continuation-in-part application. The count reads as follows:

7. A method of refining metals, especially steel and alloys which includes the steps of: in a vacuum purely electron heating the melt to be refined for eliminating volatilizable impurities and subsequently stopping the said electron heating and subjecting the thus treated melt to a heating at least partially by ion beams.

This count is directed to the method of the invention in which heating under very low pressure is accomplished by first using purely electron beams, and subsequently by using at least partially ion beams.

## The Board

The board found that this count describes a *batch* process as carried out in Figures 1 and 2 of the Treppschuh et al. patent and held that the count was not supported in Hunt's parent application. It reasoned that the step of stopping the electron heating requires that the electron beam means actually be turned off and that ion beams thereafter be employed to continue the heating of the same melt. It said that the step of "stopping the said electron heating" is a positive step in the process of the count, which is not present in a *continuous* process in which the molten metal merely flows through a furnace heated in a first section (purely) by electron beams and in a second section by ion beams; that to include such a continuous process in the count would result in an undue stretching of the language of the count beyond its clear meaning. (It is undisputed that the process disclosed in Hunt's parent application is a continuous process and not a batch process.)

## OPINION

We do not agree with the reasoning of the board and are of the opinion that the

---

1. Serial No. 477,357 filed July 27, 1965, for an "Electron Beam Furnace."

2. Serial No. 255,625 filed February 1, 1963, for an "Improved High Vacuum Furnace for Continuous Zone Processing."

3. U. S. Patent No. 3,342,250 issued September 19, 1967 on an application filed November 9, 1964 and claiming a convention date of November 8, 1963, for a "Method of and Apparatus for Vacuum Melting and Teeming Steel and Steel-Like Alloys."

4. Priority of invention was decided with respect to nine counts, but only the decision with respect to count 7 has been appealed.

circumstances here require that the term "stopping" should be given the broadest interpretation it will reasonably support. *Buck v. Desvignes,* 489 F.2d 737, (CCPA 1973); *Henderson v. Grables,* 339 F.2d 465, 52 CCPA 920 (1964). We do not see why "stopping the said electron heating" cannot be read on a continuous process in which the molten metal flows through a furnace which is heated in a first section purely by electron beams and in a second section at least partially by ion beams. Treppschuh et al. have not shown us it cannot, and we can perceive no error in the statement of the examiner: "By removing the melt the electron heating is stopped."

■ However, although we do not agree with the reason given by the Board of Patent Interferences in support of its decision with respect to count 7, our inquiry cannot end there. Our jurisdiction requires that we review *decisions* of the board and not merely its opinions. 35 U.S.C. §§ 141, 144. We must still determine whether the invention of count 7 is disclosed in Hunt's parent application. This application discloses a preferred structure of a continuous zone vacuum furnace that includes a high vacuum purification chamber including at least two adjacent hearth pots. A baffle permits molten material to flow between the pots, but effectively divides the purification chamber into a first vacuum stage and a second vacuum stage. Varied temperature conditions may be established within the respective hearth pots through the provision of separately controlled bombardment heating sources directing beams of charged particles into the melt contained within the respective hearth pots. The application states that the bombardment sources may be of various types depending upon the pressures required within the vacuum stages of the purification chamber. The only heating means expressly disclosed for high vacuum use are electron and ion beams. ("Where high vacuums are involved, the sources are commonly provided as electron or ion guns.")

In *Smith v. Horne,* 450 F.2d 1401, 59 CCPA 712 (1971), this court held that the following disclosure was sufficient under 35 U.S.C. § 112 to support a count drawn to a method for polymerizing a monomer involving the use of titanium tetraiodide as a component of a catalyst: "One or more chlorides of titanium or zirconium, the chlorides and iodides being preferred. . . . The tetrahalides are specially preferred." The working example actually described a catalyst prepared from titanium tetrachloride. The above disclosure was held to be an express teaching of titanium tetraiodide,[5] notwithstanding the contention that the disclosure did not recognize the criticality of selecting titanium tetraiodide compared to the other "specially preferred" catalyst components. The court reasoned that the advantages of using titanium tetraiodide were not significantly related to the sufficiency of the disclosure relied upon for support, because the advantages were not recited in the count.

■ In this case, as in *Smith v. Horne,* four species are immediately apparent in the disclosure relied upon for support.[6] Although Hunt's parent application does not recognize the criticality[7] of the one

---

5. One of the four "specially preferred" tetrahalides: titanium tetrachloride, titanium tetraiodide, zirconium tetrachloride, and zirconium tetraiodide. Thus, to use the words of the dissenting opinion here, there was an "alternative, don't-care, use-what-you-like kind of disclosure," which expressed no preference for any of the four species.

6. Electron-electron, electron-ion, ion-ion, and ion-electron heating means. These four species clearly appear from the *express disclosure* of ion *or* electron beam heating in two successive chambers.

7. The Treppschuh et al. patent *specification* (not the count) discloses that first a melting with electron beams is carried out to obtain the benefit of high vacuum for purifying the melt, and thereafter heating is by high pressure corpuscular beams, which include ion beams, which permits operation at higher pressures so that highly volatile alloying constituents can safely be added.

species of heating means—purely electron beams in the first chamber and ion beams (at least partially) in the second chamber—required by the count, it need not do so, because the advantages of using that species are not recited in, nor are they apparent from, the count and are not, therefore, significantly related to the sufficiency of the disclosure of Hunt's parent application. Count 7 is broad enough to read on the features ("high vacuum for purifying the melt" in the first step and "operation at higher pressures so that highly volatile alloying constituents can safely be added" in the second step) disclosed (but not claimed) in the Treppschuh et al. patent specification, wherein the selection of heating means is critical; and it is also broad enough to read on the process disclosed in Hunt's parent application, wherein the selection of heating means is not critical. One of ordinary skill in the art of metal refining could be expected to, without undue experimentation, arrive at the use of electron beams in the first chamber and ion beams in the second chamber using the disclosure in Hunt's parent application. Just as the disclosure of four specially preferred catalyst components in *Smith v. Horne* was sufficient to describe the one recited in the count, so the disclosure of four combinations (species) of heating means in Hunt's parent application is sufficient to describe the one recited in the count. There is no requirement that the party copying a claim have the same enabling disclosure as that supporting the copied claim.

There does not appear to be any material distinction between this case and *Smith v. Horne.* While here the contested limitation relates to the specific heating means employed in the process disclosed in Hunt's parent application and recited in the count, the dispute in *Smith v. Horne* was over the specific catalyst component employed in the process of the count. In our opinion this is a dis-

tinction without a difference. In both cases a limited class of only four possible species for use in the process of the count is disclosed without preference for the one claimed.[8] *See Snitzer v. Etzel,* 465 F.2d 899 (CCPA 1972).

Another distinction is that Hunt's parent application is relied upon as a prior constructive reduction to practice; whereas in *Smith v. Horne* the disclosure was relied upon for a right to make the count. In the latter situation the requirements of the first paragraph of 35 U.S.C. § 112 must be satisfied for the *full scope* of the count. In the former, however, the § 112, first paragraph requirements need only be met for an *embodiment* within the count. The difference lies in the fact that a count is a vehicle for contesting priority and may not necessarily be allowable to a winning party or be proper under § 112 (*e. g.* a phantom count). *Hedgewick v. Akers,* 497 F.2d 905, 909 n. 6, (CCPA 1974). The distinction between right to make and prior constructive reduction to practice is not material here because, as in *Smith v. Horne,* the count is drawn to a *species* rather than to a *genus.*

In view of the foregoing, we hold that count 7 is supported in Hunt's parent application. Having risked using broad language to claim their invention, Treppschuh et al. must bear the consequence that Hunt's parent application supports that language with a variation of their specific embodiment. *Hemstreet v. Rohland,* 433 F.2d 1403, 1406, 58 CCPA 743, 747 (1970).

We have considered appellant's motion, and appellees' memorandum in opposition thereto, to apportion the costs of printing certain material included in the transcript of record at appellees' request. Pursuant to Rule 5.6(c) of the rules of this court we find the material was properly included. Appellant's motion is therefore denied.

8. *In re Smith,* 458 F.2d 1389, 59 CCPA 1025 (1972), relied on by the dissenting opinion, was cited by neither party here and is clearly distinguishable. The disclosure relied upon there for support for a claim to a subgenus encompassed an infinite number of subgenera.

The decision of the board with respect to count 7 is *reversed.*

*Reversed.*

RICH, Judge, dissenting, with whom MARKEY, C. J., joins.

While I agree with the majority that the *reasoning* of the board was wrong,[1] I respectfully disagree with the conclusion that Hunt's parent application discloses the invention of count 7 and with the reasoning on which that conclusion is based.

My disagreement involves two matters: First, the way the majority goes about finding in Hunt's parent application something that is not there—which the majority opinion tacitly admits is not there; and, second, its misconstruction and misapplication of our decision in *Smith v. Horne,* 450 F.2d 1401, 59 CCPA 712 (1971), which involved a fact situation not at all comparable to the facts here. I shall discuss these matters separately.

### Hunt's Parent Does Not Disclose Count 7

Count 7 defines an invention consisting of a sequence of three steps, but the critical part of it for the purposes of decision is the specific limitation that the first step is vacuum melting by "purely electron heating." The heating *must* be by electron heating and by electron heating *alone.* Nowhere does Hunt's parent *teach* this concept. One skilled in the art reading Hunt's parent will never learn the invention of count 7, which is a "must" invention, not a "may" invention. The heating in step one must be by electron heating.

The majority tacitly admits that Hunt's parent does not disclose the invention. It says (footnote omitted):

\* \* \* Hunt's parent application does not recognize the criticality of the one species of heating means—purely electron beams in the first chamber \* \* \* required by the count \* \*.

The "criticality" is the essence of the invention of count 7. If Hunt did not recognize it, how could he disclose it, how can others find out about it by reading his parent application, and how can that application be either support for the count or a constructive reduction to practice of a process within the count?

What the majority does is to construct a fictitious situation. As it states, according to the disclosure of the Hunt parent application "the bombardment sources may be of *various types,* depending upon the pressures \* \* \*. 'Where high vacuums are involved, the sources are *commonly* provided as electron *or* ion guns.' " (My emphasis.) The majority then takes this vague, alternative, don't-care, use-what-you-like kind of disclosure of various heating means and, by 20/20 hindsight, itself *creates* out of all the various *possibilities,* none of which is specifically taught or disclosed or conveyed to one skilled in the art by Hunt as a must, four *"species,"* as set forth in footnote 6, in order to be able to make a forced and false comparison with the facts in *Smith v. Horne,* which did involve an express disclosure of chemical species. Hunt's parent does not disclose any such "species." The majority then itself *selects* one of these undisclosed "species" of its own creation and holds that it is an "embodiment" of the invention of count 7, necessitating an award of priority to Hunt—who admittedly did *"not recognize the criticality of the one species,"* as does the majority. (My emphasis.) Priority should not be awarded to one who did not even recognize the invention.

The majority's reference to "the disclosure of four combinations of heating means (species) in Hunt's parent application" is a reference to its own creation, not to anything Hunt disclosed. Hunt does not mention the necessity of using *any* particular sequence of steps (and count 7 calls for a specific sequence) and he does not mention the necessity of using electron beam heating in the *first*

---

1. This discussion is irrelevant to the decision and superfluous.

step (and count 7 *requires* therein electron beam heating). Hunt teaches *away* from any such necessity by his express disclosure that the heating can alternatively be by the common practice of using electron *or* ion guns with high vacuum. Count 7 permits of no such alternatives. As the majority recognizes in calling it a "species," it is *specific.*

In effect, Hunt's parent application hands the majority (and the art) the equivalent of a child's Erector Set and the majority, having knowledge of the Treppschuh et al. disclosure and the requirements of count 7, finding all the necessary *parts* present, proceeds to construct the count, along with three other inventions. But a box of girders, nuts, and bolts with instructions to use them any way one likes is not a disclosure of any particular structure, no matter how many species *can* be constructed.

This aspect of the case involves a simple question of fact—what is disclosed—and no abstruse question of patent law. The only law involved is that the burden is on the party copying a claim from a patent to establish that he has support for it in his application. *Smith v. Wehn,* 318 F.2d 325, 50 CCPA 1544 (1963). Hunt has not sustained that burden as to his parent application.

*Smith v. Horne is Not a Case in Point*

The majority bases its decision on *Smith v. Horne,* supra, as if it were on all fours with the present case. By showing that the Hunt parent application does not, as a matter of *fact,* disclose the invention of count 7, I have really made unnecessary a discussion of *Smith v. Horne* or any other case in which we have found, as a matter of fact, that there is a disclosure. However, the majority seems to see some

analogy with the facts in *Smith v. Horne* which compels me to conclude that they fail to see the possibly subtle but nonetheless fundamental distinction between the two fact situations. If the cited case stands for what the majority is making it stand for here, it was wrongly decided and should be overruled as misleading to the examining corps.[2] Finding disclosures in parent applications which are not there can lead to the issuance of many invalid patents because such findings can be used to antedate references. The significance of the majority decision here is not limited to interferences. I will therefore point out how this case differs from *Smith v. Horne.*

Preliminarily, I am unable to understand why the majority focuses so intently on this single case, involving a fact situation hardly comparable to that before us. We have subsequently given much closer attention to the problem, suggesting "a more stringent requirement," pointing out that this field of the law is one which must be left to case-by-case development. For instance, see Judge Lane's elaborate discussion—apparently forgotten—in a case decided 6 months after *Smith v. Horne,* in which we held the appellant could not rely on the filing date of an earlier application, even partially overruling what we said in *In re Risse,* 378 F.2d 948, 54 CCPA 1495 (1967), one of the cases relied on by appellant in *Smith v. Horne.* I refer to *In re Smith,* 458 F.2d 1389, 59 CCPA 1025 (1972), particularly part I of the opinion. *In re Smith,* does not leave *Smith v. Horne,* as a precedent of any importance. *Smith v. Horne* was still fresh in our minds when we decided *In re Smith,* yet the latter does not even mention the former.

*Smith v. Horne* (so denominated) was a three-party interference involving

---

**2.** The way the majority interprets *Smith v. Horne* is, in my view, contrary to this court's decision in *Prutton v. Fuller,* 230 F.2d 459, 463, 43 CCPA 831, 835–36 (1956). The court there said:

It is clear, however, that when an applicant recites two or more lists of ingredients and indicates that any one in one list may be combined with any one in another, he is not necessarily entitled to claim any specific combination of elements which may fall within the scope of such a disclosure, and we have so held. [Authorities cited.]

*Smith v. Horne,* incidentally states the same burden of proof as in *Smith v. Wehn,* supra.

Smith and Horne and Slocombe applications. The two appellees had similar disclosures but the court reasoned out the issue of right to make on the basis of the Slocombe application. The invention was a polymerization method utilizing a catalyst of two components, one of which was titanium tetraiodide, $TiI_4$. Polymerization is a one-step reaction, not a combination of steps as in the present case. The question was whether Slocombe and Horne disclosed such a catalyst, with specific reference to the $TiI_4$ component. The board and this court both held that they did. There was no issue involving the other materials used in the reaction other than the $TiI_4$ component of the catalyst. Slocombe's disclosure was that he preferred to use chlorides and iodides of titanium or zirconium and also preferred tetrahalides; the one working example disclosed $TiCl_4$. The board held, and the court agreed, that the disclosed alternative of using iodides in place of chlorides would teach one skilled in the art to use $TiI_4$ and that there was support for the count and consequent right to make it. This kind of disclosure is not comparable to the nondisclosure here where Hunt's parent application expresses indifference as to the heating means used in the first step, no preference at all as to any kind of heating anywhere in the three-step process, contains no indication of the necessity for using electron beams in the first step, and where such failure of preference collides with the count 7 limitation to "purely" electron beam heating. *Smith v. Horne* involved the application of a stated test, which the court found in *Prutton v. Fuller,* note 2, supra, namely, "whether the application would fairly suggest to the skilled worker in the art the particular [invention] claimed, or whether the desirability of that composition could be ascertained only by extensive experimentation." The specific example taught $TiCl_4$ and taught possible substitution of iodine for chlorine (a recognized usual equivalency), or the use of $TiI_4$. This is a far cry, factually, from anything before us now. There is no analogy between this case and *Smith v. Horne* and

the majority errs in finding one through the device of inventing four "species" for Hunt of which he disclosed no appreciation.

The basic error in the majority opinion is, in my opinion, the finding of Hunt's non-existent "disclosure of four combinations of heating means," from which it is reasoned that he thereby disclosed the one critical combination.

Finally, I note that appellant Hunt never cited *Smith v. Horne,* nor did appellees. Perhaps they appreciated how irrelevant it is.

For the above reasons, I would affirm.