**Application of John Nicholson GARDNER.**
**Patent Appeal No. 8923.**

United States Court of Customs and Patent Appeals.
April 5, 1973.

Rehearing Denied June 14, 1973.

Before MARKEY, Chief Judge, RICH, BALDWIN and LANE, Judges, and ALMOND, Senior Judge.

MARKEY, Chief Judge.

This appeal is from the decision of the Board of Appeals, affirming the rejection under the first paragraph of 35 U.S.C. § 112 of claim 2 of appellant's application, serial No. 679,670, filed November 1, 1967, for "Guanidinoalkylbenzodioxan Derivatives." [1] We reverse.

## THE INVENTION

The application is directed to a class of guanidinoalkyl–1:4-benzodioxan compounds which are useful as antihypertensive agents. Claim 2 reads:

2. A compound selected from the group consisting of a base of the formula:

$$[7] \quad R_1 \!\!-\!\!\left\langle \begin{array}{c} \text{benzodioxan} \end{array} \right\rangle \!\!-\!\! CH_2 \!-\! NH \!-\! \overset{\overset{\displaystyle NH}{\|}}{C} \!-\! NH_2$$

and a nontoxic, pharmaceutically acceptable acid addition salt thereof, wherein $R_1$ is a member of the group consisting of hydrogen, methyl, methoxy, chlorine and bromine.

## THE REJECTION

The examiner's rejection under 35 U.S.C. § 112 was couched in general terms, the claim being described as "too broad" in view of the lack of support in the specification for all the compounds encompassed by the substituent group $R_1$ and the floating position thereof. Express mention was made in the Answer of the lack of a "showing that all of the compounds * * * would possess the asserted utility."

The board stated:

We think the Examiner has made it clear, considering his various statements in context, that his rejection is

Alan D. Lourie, Philadelphia, Pa., of record, for appellant; William A. Smith, Jr., Washington, D. C., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents; Jack E. Armore, Washington, D. C., of counsel.

1. A continuation-in-part of serial No. 251,471, filed January 15, 1968, now U.S. 3,360,529.

based upon the requirements of the first paragraph of 35 U.S.C. 112 as to the "written description of the invention" and "the manner of - - - using it."

So interpreted, the rejection was sustained "for the reasons set forth in our decision in the parent case Serial No. 251,471 * * *." The fact that the present claim was considerably reduced in scope from the parent claims was not felt to render the prior reasons inapplicable. In this earlier opinion, made of record here, the basis for affirming the 112 rejection was applicant's failure to establish that the substituents on the basic guanidinoalkyl–1:4-benzodioxan nucleus had no profound effect on the antihypertensive activity of the compounds. Certain disclosure in that specification was deemed adequate support for the examiner's doubts as to the universal applicability of the asserted utility.

## OPINION

We approach the rejection as structured by the board and argued by the solicitor. Accordingly, the issues lie in whether the separate but related description and how-to-use requirements of the first paragraph of 35 U.S.C. § 112 have been satisfied.

Claim 2 covers a total of 17 compounds and in fact delineates a subgenus of the broad class of guanidinoalkyl–1:4-benzodioxan derivatives disclosed in the application. Only three of the five possible $R_1$ substituents are specifically exemplified and substitution in these examples is always in the 7-position of the benzodioxan nucleus. As pointed out by the solicitor at oral hearing, no explicit language is found in the main body of the specification corresponding to the subgenus defined by the claim.

■ But we see no need for either additional representative examples or more definite language to satisfy the description requirement. Claim 2, which apparently was an original claim, in itself constituted a description in the

original disclosure equivalent in scope and identical in language to the total subject matter now being claimed. See In re Anderson, 471 F.2d 1237 (CCPA 1973). Nothing more is necessary for compliance with the description requirement of the first paragraph of 35 U.S.C. § 112.

The major question centers around the sufficiency of the disclosure with respect to the how-to-use requirement. The primary contention of the Patent Office is that reasonable basis exists for doubting that all of the compounds encompassed by claim 2 have the asserted utility, i. e. antihypertensive activity. As in the parent case, appellant's own disclosure is said to provide the basis for doubt.

■ Adequate support for the Office's assertions is an essential requirement for sustaining his rejection under In re Marzocchi, 439 F.2d 220, 58 CCPA 1069 (1971) and In re Cook, 439 F.2d 730, 58 CCPA 1049 (1971). If such support be sufficient, appellant's failure to provide rebuttal evidence would require affirmance. In re Fouche, 439 F. 2d 1237, 58 CCPA 1086 (1971).

The case thus turns on the pertinent disclosures in the specification. The first statements concerning utility read:

The generic group of compounds of this invention is characterized by having the basic guanidinoalkyl–1,4-benzodioxan nucleus which imparts antihypertensive activity to such compounds. The substituents on the basic structure may be any of those common to the art, such as those disclosed in U. S. Patent No. 2,979,511 without changing the qualitative hypotensive activity of these compounds.

The compounds of this generic invention demonstrate antihypertensive activity by blockage of adrenergic nerve after intravenous administration of doses of 5–25 mg./kg. in the standard chloralose anesthecized [sic] dog procedure * * * Further quantitative properties of this group

1392

of compounds will be elaborated on hereafter.

The mentioned *quantitative* properties are set forth in this paragraph which has become the focal point of the rejection:

> The new 1:4-benzodioxan derivatives of the invention have been found to exhibit varied pharmacological activity in the animal body. Thus compounds falling within the definition of Formula 1 have been found to exercise pharmacological actions on the peripheral nervous system, particularly on the sympathetic and parasympathetic nervous systems. For instance, some of the compounds such as 2–1′—guanidinoethyl–1:4-benzodioxan have very pronounced adrenergic nerve blocking activity, some such as 5:8–dimethyl – 2′ – guanidinomethyl – 1:4–benzodioxan have pronounced ganglion blocking activity and antihistaminic activity. All have these activities to a certain degree.

That variations in the substitutents on the basic guanidinoalkyl–1:4-benzodioxan nucleus result in diverse pharmacological activities formed the basis for the Office's position that these substituents may well be critical to the asserted antihypertensive activity. Statements that "some of the compounds . . . have very pronounced adrenergic nerve blocking activity" and "some . . . have pronounced ganglion blocking activity and anithistaminic activity" were interpreted as indications that different substituents lead not just to quantitatively distinguishable effects but to qualitative differences. The fact that "all" are said to have "these activities to a certain degree" was not believed to require a conclusion of universal usefulness as antihypertensive agents, the possibility of zero effectiveness still existing.

The rejection under consideration, as we have said, centers on the how-to-use requirement of § 112. It is not based on the utility requirement of § 101. But as this court pointed out in *Fouche,* absence of the asserted utility may properly lead to a rejection under either provision. Hence the only matter to be determined is the reasonableness of the Patent Office's doubts. The standard to be applied, however, is just that—the *absence* of utility. As we said in *Fouche,* there is no requirement in § 112 that all of the claimed compounds have the same degree of utility. Some antihypertensive activity coupled with knowledge as to the employment of this activity is all that is necessary to satisfy the how-to-use requirement.

Considering the utility disclosure as a whole, we can find no reasonable basis for concluding that the compounds encompassed by claim 2 would not have at least some antihypertensive activity. As pointed out by appellant, the present specification contains an augmented disclosure over the parent case. The positive statements at the beginning of the specification that variances in the substituents will not qualitatively affect the asserted activity cannot be ignored. Nor is the later disclosure of varied activities inconsistent with the existence of basic antihypertensive activity. Whether the additionally described ganglion blocking activity is merely another mechanism for achieving the antihypertensive effect, as argued by appellant, or is a distinct activity is immaterial. We think the only reasonable interpretation that can be given to the concluding sentence of the controversial paragraph is that all of the compounds possess each of the aforementioned activities, although in varying degrees. A zero level of antihypertensive effectiveness is neither realistic nor consistent with the rest of the disclosure, considering particularly the specific dosages described for the compounds in general at the beginning of the specification.

The Patent Office having shown inadequate support for its doubts as to the asserted utility, the decision of the board must be reversed.

Reversed.